CLERKS OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED

3/31/2021

JULIA C. DUDLEY, CLERK
BY:  s/ CARMEN AMOS
DEPUTY CLERK

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF VIRGINIA
## LYNCHBURG DIVISION

|  |  |
|---|---|
| JOHN CLINTON MCCLAIN, III, | CASE NO. 6:19-cv-00011 |
| *Plaintiff*, | |
| v. | MEMORANDUM OPINION |
| LYNCHBURG CITY SCHOOLS \| LYNCHBURG CITY SCHOOL BOARD; | JUDGE NORMAN K. MOON |
| *Defendants.* | |

Plaintiff John Clinton McClain, III, filed this action against his former employer, Defendant Lynchburg City Schools/Lynchburg City School Board ("LCS"), asserting claims under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e, et seq., and 42 U.S.C. § 1981. Dkt. 1.

LCS's motion for summary judgment against McClain is before the Court. Dkt. 27. Because there is no genuine dispute of material fact on this record regarding McClain's Title VII and § 1981 retaliation claims,[1] the Court will grant LCS's motion for summary judgment on Counts I and III.

---

[1] McClain's complaint also included separate claims of hostile work environment in violation of Title VII and § 1981. In response to the motion for summary judgment, McClain elected to abandon those claims. Dkt. 32 at 31. Accordingly, the Court will dismiss Counts II and IV without further discussion.

## I.      FACTUAL BACKGROUND

The following facts are either undisputed or presented in the light most favorable to McClain as the nonmoving party.

### A.  McClain's Employment with the LCS Central Office

In 2014, LCS hired McClain, who is Caucasian, as one of two assistant superintendents. Dkt. 1 ¶ 6. McClain served as Assistant Superintendent for Student Learning and Success and was responsible for curriculum and instruction. Dkt. 32-2 at 60. Ben Copeland, another Caucasian, served as Assistant Superintendent for Operations and Administration. *Id.* at 51. As early as 2016, McClain and Copeland had "difficulty . . . working together." *Id.* at 55–59.

When Superintendent Scott Brabrand left LCS at the end of June 2017, Larry Massie, who is also Caucasian, became Interim Superintendent. Dkt. 29-4 at 13. McClain worked with Copeland and Massie at LCS's Central Office, the district's administrative building. At the beginning of the 2017–2018 school year, the following individuals also worked at the Central Office: Chief Financial Officer Anthony Beckles, who is African-American; Personnel Director Marie Gee, who is Caucasian; Directors Ethel Reeves and LaTonya Brown, who are both African-American; and Supervisors Twanna Hancock, Maria Jaeger, and Dixie Sears. Hancock is African-American and Jaeger and Sears are both Caucasian.

### B.  Hancock's Promotion, Transfer, and Complaint to LCS

McClain recruited Hancock, who had been an elementary school teacher for LCS since December 2013, to coordinate LCS teachers' professional development in 2016. Dkt. 32-2 at 68–70. McClain served as Hancock's direct supervisor and promoted her to become a supervisor of five elementary school instructional coaches in July 2017. *Id.* at 70–72.

On November 2, 2017, Massie and Gee received an anonymous letter accusing Hancock of "bully[ing] and intimidat[ing]" the instructional coaches she supervised. Dkt. 29-8 at 2. The letter noted that one of the instructional coaches had tried to discuss Hancock's "unapproachable and dismissive" attitude with McClain but found that McClain "backs Mrs. Hancock in all matters." *Id.* "It is doubtful," the letter continued, that "[McClain] has even asked [Hancock] to adjust her administrative style." *Id.* The letter asked Massie and Gee to conduct a "confidential investigation" because its authors "fear[ed] retaliation by Mrs. Hancock and Dr. McClain." *Id.* The letter concluded, "I am afraid to sign this letter for obvious reasons, fearful of reprimand from Mrs. Hancock and Dr. McClain." *Id.*

After interviewing instructional coaches and principals about Hancock's performance, Massie and Gee decided to reassign Hancock to a sixth-grade teaching position. Dkt. 29-12. On November 27, Massie sent Hancock a letter informing her of the transfer, which became effective the next day. Dkt. 29-12. On the same day, Hancock filed a complaint with the LCS Board requesting a formal investigation into her reassignment. Dkt. 29-15.[2]

### C. McClain's Complaint to the LCS Board and Subsequent Investigation

Three days later, on November 30, McClain filed a formal "Report of Harassment" with the LCS Board on behalf of himself, Hancock, Brown, and Reeves against Massie and Copeland. Dkt. 29-7. McClain's complaint included detailed allegations that Massie created a hostile work environment for African-American (especially women) employees in the Central Office. *Id.* at 4. McClain also detailed personal experiences where he was "bull[ied] and harass[ed] by Dr. Massie." *Id.* He described three instances in which Massie publicly questioned him "in a confrontational manner." *Id.* at 4. McClain noted that on each of these occasions, other participants

---

[2] Hancock resigned in February 2018. Dkt. 32-5 at 130–31.

either referred to Massie's questioning as "an inquisition" or approached McClain afterward to "express concern for the way" Massie treated McClain. *Id.* McClain also claimed that Massie had (1) "[r]emov[ed] [McClain] as the Superintendent's designee for the 2017–2018 school year," (2) "[r]emov[ed] the office of student services, alternative education, and behavior support from [McClain's] supervision without rationale or ability for [him] to comment or ask questions," (3) "[a]ppoint[ed] Ben Copeland to lead a decision" on an academic issue that McClain had managed the previous year, and (4) "[d]irect[ed] April Bruce to lead various projects that ha[d] been under [McClain's] supervision, without rationale or explanation to [him]." *Id.*

The LCS Board appointed Linda Hall, University of Lynchburg's Director of Human Resources and an African-American woman, to investigate McClain's complaint. Dkts. 29-17 at 5; 32-35 at 5–6. LCS's outside counsel, who is also University of Lynchburg's outside counsel, reached out to Hall to ask her to conduct the investigation. Dkt. 32-35 at 8–10. Hall had experience conducting Title IX investigations into student and employee allegations of sex and gender discrimination, but she had no experience conducting Title VII investigations into employee allegations of race discrimination or retaliation. *Id.* at 7–8.

On January 18, 2018, Hall presented a report of her findings to the LCS Board. Dkt. 29-18 at 2–4. After interviewing several LCS Central Office employees, Hall concluded that her investigation did not support McClain's allegations. *Id.* at 2. In particular, she noted that she had asked Brown and Reeves "directly if they experienced harassment from Dr. Massie or Mr. Copeland based on their race. Both indicated they did not feel any concerns or issues were experienced based [on] race." *Id.* Hall also discussed three "general observations" about McClain based on the interviews she conducted. *Id.*

First, Hall noted negative feedback about the instructional programs McClain implemented: "Many feel that Dr. Brabrand gave Mr. McClain too much authority/autonomy. There is a perception that programs (teacher in-class observations [were] mentioned) implemented by Mr. McClain have directly or indirectly led to a mass exodus of good teachers and principals from the LCS system in recent years." *Id.* at 3. In addition, she found that many people she "talked to perceived that some of Mr. McClain's requirements created too much extra work with no results to support the necessity of [them] being done." *Id.* at 4.

Second, Hall discussed concerns about McClain's promotion and management of Hancock. In her investigation, she found that several employees complained about Hancock, including about McClain's appointment of Hancock as a supervisor in the first place. *Id.* at 3. But McClain claimed that he never received any complaints about her performance. *Id.* Others, however, told Hall that McClain ignored or refused to resolve complaints about Hancock. *Id.* Hall noted "a systemic fear by other employees of retaliation by Mr. McClain if they were to complain about Ms. Hancock." *Id.* Hall wrote that "[o]ne could conclude that Mr. McClain bears some culpability in the situation leading to Ms. Hancock's transfer." *Id.*

Third, Hall opined that McClain's formal complaint illustrated an uncooperative, self-interested attitude:

> If Mr. McClain had concerns about Dr. Massie and Mr. Cop[e]land, there is no documentation of any conversation initiated by him with them to address those concerns, as would be expected of a peer administrator. I find it curious that Mr. McClain did not make a complaint on his own behalf, stating "he was in a protected class," but rather that he felt compelled to speak out on behalf of African American females because they are a protected class. Mr. McClain stated he sought legal counsel before filing this report, which also reflects an adversarial posture towards his senior administrators rather than a constructive approach to addressing any concerns he might have. Dr. McClain also references in his complaint School Board Policy GBA regarding retaliation against students or school personnel who report harassment. Dr. McClain's conduct and approach could lead a reasonable investigator to conclude that he filed this complaint to protect himself and his

position, and not to advance the legitimate interests of the protected class of individuals he mentions in his complaint.

*Id.* at 3. Hall also mentioned that McClain "seems to understand that he has created a very uncomfortable situation for the senior management team by making these allegations." *Id.*

On February 6, the LCS Board's Personnel Committee adopted Hall's report and findings and sent McClain a copy of the report along with a letter informing him that the investigation into his complaint was closed. Dkt. 29-20.

On February 12, McClain timely appealed the LCS Board's decision. Dkt. 29-21 at 2–3. He argued that the investigation was biased, that the report inaccurately captured Brown and Reeves's beliefs about the "impact of race in the workplace," and that the report lacked context for some of the complaints against McClain. *Id.* at 3. Specifically, McClain noted that "in-class observations and some other expectations of schools came directly from agreements with the Virginia Department of Education due to schools not being accredited, and from the Office of Civil Rights regarding academic rigor and discipline for African American students." *Id.*

Two weeks after McClain filed his appeal, LCS Board Chairman Michael Nilles sent McClain a letter informing him that the LCS Board had considered his appeal but upheld Hall's report and considered the investigation into his complaint closed. *Id.* at 4.

### D. Massie's Actions After McClain Filed His Complaint

On December 14, 2017, about three weeks after McClain filed his complaint, Beckles sent Massie an email expressing his "concern" that McClain was "being disrespectful" to Massie when McClain announced that Massie was responsible for eliminating Hancock's position. Dkt. 32-63. "[I]t was evident," Beckles wrote, "that [McClain] did not agree with the decision and that the decision was all yours. Again, he disrespected you in front of your senior leadership team and principals." *Id.*

6

On January 8, 2018, Gee prepared and signed a typewritten document detailing Massie's "expectation" that McClain would share the news with the Student Learning and Success staff without "undercut[ting] Dr. Massie in the process," even if he disagreed with Massie's decision to eliminate Hancock's position. Dkt. 32-62. Instead, McClain emailed his staff: "As you may be aware, recently Dr. Massie eliminated the role of supervisor of professional learning effective at the end of November." *Id.*

Massie sent copies of Beckles's email and Gee's document, along with McClain's email, to LCS counsel at McGuireWoods on February 15, with a memorandum stating, "I am enclosing copies of recent correspondence that is indicative of the situation with which I am contending at present." Dkt. 32-64.

Then, on February 20, Massie sent the Lynchburg City Attorney and LCS's outside counsel materials that he had collected while investigating Hancock's promotion. The material purportedly showed that McClain had improperly promoted Hancock "without the knowledge or approval" of the LCS Board. Dkt. 32-66.

Finally, Massie identified McClain's Student Learning and Success department as "overstaffed" during a presentation that answered questions from the Lynchburg City Council about LCS's budget. Dkts. 32 at 16; 32-22 at 17–18; 32-70 at 2–3. To support Massie's assertion, Beckles and Gee created a list of all personnel added under McClain's tenure as Assistant Superintendent for Student Learning and Success from 2014 to 2018. Dkts. 32-8 at 112 (Gee: "We did add a lot of personnel under Dr. McClain."); 32-69.

### E. Edwards's Start as Superintendent and LCS Reorganization

In December 2017, LCS selected Crystal Edwards, an African-American woman, as its next superintendent, effective April 1, 2018. Dkt. 29-24. Following Edwards's selection as the

next LCS Superintendent, McClain reached out to her in late December 2017 to introduce himself. Dkt. 32-2 at 170–71. He recalls Edwards saying during their phone call that his role as the assistant superintendent responsible for curriculum and instruction was perhaps the most important role in the district. *Id.*

Before Edwards took over, she spoke to her predecessor Massie about the LCS budget for the coming school year. Dkts. 29-4 at 23–24; 29-24; 29-26 at 7–8. He told her that if LCS could get level funding for academic year 2018–2019—the same contribution from the City of Lynchburg that the district had received during academic year 2017–2018—LCS would still have a significant financial shortfall of roughly $372,000. Dkts. 29-4 at 24; 29-26 at 8. Massie did not suggest any specific budget cuts to Edwards. Dkts. 29-4 at 24; 29-26 at 8. Edwards also asked Massie about McClain's complaint against him. Dkt. 32-10 at 50. Massie declined to discuss it with her and instead directed her to speak with the LCS Board. *Id.*  Nilles does not recall speaking with Edwards about McClain. Dkt. 32-9 at 39. After Edwards took over as LCS Superintendent, Copeland "ma[d]e sure that she was aware that there was a strained relationship between" Copeland and McClain. Dkt. 29-5 at 5. Copeland informed Edwards that McClain "can't work as a team and doesn't collaborate very well" and "that [McClain] had filed a complaint [in] November of the previous year and then he had appealed the investigator's results and appealed the board decision." *Id.* at 6.

Ultimately, the City granted level funding but refused to give the district additional money to purchase new buses, leaving LCS with a projected $1 million shortfall. Dkt. 29-26 at 9.

Edwards decided to make personnel cuts to balance the budget. Dkt. 29-26 at 10, 15. Because of her experience with curriculum, instruction, assessments, and professional development, she identified McClain's position as one that she could eliminate. *Id.* at 10. In LCS's

budget projections for FY 2018–2019, Edwards calculated that eliminating McClain's Assistant Superintendent for Student Learning and Success position would save the district up to $174,547. Dkt. 29-28 at 5.

Edwards eliminated twelve positions, including McClain's role. Dkt. 29-29. Edwards met with five of the eleven LCS employees whose positions she eliminated and told them that they could choose any open teaching position or apply for any position for which the district had posted a hiring notice. *Id.*; Dkt. 29-26 at 12. At the same time, she moved the other six employees, whose positions she eliminated, into newly-created roles—without requiring them to apply or to accept teaching positions first. Dkt. 29-29. Two of the employees who were reassigned to newly-created roles were Copeland, who was promoted to deputy superintendent, and Bruce, who was promoted to Director of Curriculum and Instruction. *Id.*

In June 2019, LCS discovered $862,000 in its existing budget and returned it to the Lynchburg City Council. Dkt. 32-22 at 20–24.

### F. McClain's Separation from LCS

On May 2, Edwards met with McClain and informed him that LCS was eliminating his position effective July 1, 2018, and that he could choose any open LCS teaching position. Dkt. 29-30. The next day, McClain emailed Gee that he was not interested in a teaching position for the following school year. Dkt. 29-31.

On May 4, McClain emailed Edwards and asked LCS to provide "paid leave for [him] through June 30th and severance of three months' salary so that . . . [he could] take the steps needed to find another job and undertake all that is required for a move." Dkt. 32-74 at 1.

In her May 5 email response, Edwards again noted that McClain had "the opportunity to take any classroom teaching position for which [he was] certified and qualified" and acknowledged

that McClain already had contacted Gee by email and declined a teaching position. *Id.* McClain took FMLA leave beginning on May 9. Dkt. 29-32 at 2–5.

Edwards also sent a letter—dated May 4—reiterating that McClain's position was being eliminated "in response to budget constraints and [her] judgment as to the reorganization needed to achieve the current and future division educational goals," "not based on employee performance," and that he could choose any open LCS teaching position for which he was certified and qualified. Dkt. 29-30. The letter instructed McClain to contact Gee "to discuss [his] options and intent before May 11, 2018" and noted that LCS would consider declining a teaching position to be a "voluntary resignation." *Id.* It also noted that McClain could "apply for any of the newly created 2018–19 positions for which [he was] certified and qualified." *Id.* McClain received this letter on May 18. Dkt. 29-32 at 6.

That same day, Edwards also emailed McClain noting that his decision to decline a teaching position was considered a "voluntary resignation." Dkt. 32-75 at 1. In his May 21 email response, McClain contested Edwards's characterization of events and argued that he had not previously been offered the opportunity to apply for newly-created nonteaching positions:

> To be very clear, I have not voluntarily resigned nor have I tendered my resignation. My position was "eliminated" and my only option was to accept a demotion, not only in pay, but in supervisory authority. I have been placed in a position where I have no options other than to be terminated from employment.
>
> As it relates to the May 4, 2018 letter, the letter I received was not post-marked until May 16, 2018 and I did not receive it until May 18, 2018. This letter, corresponding with your May 18, 2018 email, is the first time that anyone indicated to me that my termination was a "voluntary resignation" and I vehemently disagree that I voluntarily resigned in any capacity. I was forced out. Also, you indicate in the letter that I should contact Ms. Gee to discuss "options and intent" before May 11, 2018; however, as noted, that date had already passed prior to either the mailing or receipt of your letter.

*Id.*

Edwards responded by email on May 22 that "[t]his is not a termination" and noted:

> You were also afforded the opportunity to apply for any of the newly created 2018–19 positions for which you are certified and qualified. Those positions include supervisor positions with supervisory responsibilities. This offer was given to all employees whose positions were eliminated and these new positions have been publicly advertised. You have not applied for any of these new positions.

*Id.* at 2. The email also indicated that McClain could still accept a teaching position until May 25. *Id.* It closed with another reference to applying for newly-created nonteaching positions: "Of course, by accepting a teaching position, you may still apply for administrative or supervisor vacancies for which you are qualified, and your acceptance of the teaching position will not prejudice you in consideration of other positions." *Id.*

McClain informed LCS that he would be on leave through the end of the school year. Dkt. 32-85 at 2. Three days later, McClain received a letter from Gee informing him that LCS had suspended his access to LCS email, operations and management programs, and properties. *Id.* at 1–2.

## II.    LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party," and "[a] fact is material if it might affect the outcome of the suit under the governing law." *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018). The nonmoving party must "show that there is a genuine dispute of material fact . . . by offering sufficient proof in the form of admissible evidence." *Id.* (quoting *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016)) (internal quotation marks omitted). The district court must "view the evidence in the light most favorable to the nonmoving party" and "refrain from weighing the evidence or making credibility determinations." *Id.* "Although the court must draw all justifiable inferences in

favor of the nonmoving party, the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013).

### III.   ANALYSIS

Title VII's anti-retaliation provision prohibits an employer from "discriminat[ing] against" an employee because that employee "opposed any practice made" unlawful by Title VII or "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under Title VII. 42 U.S.C. § 2000e-3(a).[3] An employee may show an employer's action was taken with "retaliatory intent through direct evidence or through the burden-shifting framework of *McDonnell Douglas Corporation v. Green*." *Strothers v. City of Laurel*, 895 F.3d 317, 327 (4th Cir. 2018) (citing *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 249 (4th Cir. 2015)).

To establish a prima facie case of retaliation under Title VII using the *McDonnell Douglas* framework, an employee must show "(1) []he engaged in a protected activity; (2) the employer acted adversely toward h[im]; and (3) there was a causal connection between the protected activity and the asserted adverse action." *Id.* (quoting *Ziskie v. Mineta*, 546 F.3d 220, 229 (4th Cir. 2008)).[4] If the employee establishes a prima facie case of retaliation, the employer may rebut the case by offering a legitimate nonretaliatory reason for the adverse action. *Foster*, 787 F.3d at 250. If a legitimate nonretaliatory reason exists, then the employee must show that the reason offered is a pretext for retaliation. *Id.*

---

[3] In July 2018, McClain filed a charge of discrimination against LCS with the Equal Employment Opportunity Commission ("EEOC"). Dkt. 1 at 2. He received a Dismissal and Notice of Rights from the EEOC in February 2019. *Id.* Having exhausted his administrative remedies, McClain filed this action against LCS in March 2019. *Id.*

[4] The elements of a prima facie retaliation claim are the same under Title VII and § 1981. *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 281 (4th Cir. 2015) (en banc) (citing *Honor v. Booz-Allen & Hamilton, Inc.*, 383 F.3d 180, 188 (4th Cir. 2004)).

### A. Prima Facie Case

#### 1. McClain's Protected Activity

LCS concedes that McClain engaged in a protected activity in November 2017, when he complained to the LCS Board that Massie and Copeland discriminated against Hancock and other African-American employees. Dkt. 29 at 24. Thus, McClain has shown the first element of a prima facie case of retaliation.

#### 2. LCS's Adverse Action

For the purposes of its motion for summary judgment, LCS concedes that it took a materially adverse action against McClain in May 2018 when Edwards demoted him by eliminating his superintendent position and offering him a teaching position instead. Dkts. 29 at 24; 34 at 7 n.2. Because LCS concedes that Edwards's elimination of McClain's position and demotion to a teaching position constitutes an adverse action, McClain has shown the second element of a prima facie case of retaliation.

#### 3. Causal Link

"[E]stablishing a 'causal relationship' at the *prima facie* stage is not an onerous burden." *Strothers*, 895 F.3d at 335 (quoting *Foster*, 787 F.3d at 251). Although the Supreme Court held in *University of Texas Southwestern Medical Center v. Nassar* that "Title VII retaliation claims must be proved according to traditional principles of but-for causation," 570 U.S. 338, 360 (2013), the Fourth Circuit has since held that an employee need not show "that [his] protected activities were but-for causes of the adverse action" at the prima facie stage. *Strothers*, 895 F.3d at 335 (citing *Foster*, 787 F.3d at 251) (holding that, even after *Nassar*, but-for causation in a Title VII retaliation case must be shown only at the pretext stage of the *McDonnell Douglas* burden-shifting framework).

13

Instead, when the alleged adverse action takes place soon after the employer becomes aware of the protected activity, the plaintiff can make out a prima facie causal link. *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (per curiam) (noting that "temporal proximity between an employer's knowledge of protected activity and an adverse employment action" must be "very close" to raise an inference of causation); *see Carter v. Ball*, 33 F.3d 450, 460 (4th Cir. 1994) (finding causation where employee's demotion occurred less than six months after he filed complaint of racial discrimination). Conversely, a "lengthy time lapse . . . negates any inference that a causal connection exists between the two." *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998) (holding that three years is too long to show causation); *Causey v. Balog*, 162 F.3d 795, 803 (4th Cir. 1998) (holding that thirteen months is too long to show causation in the absence of other evidence of retaliation).

Here, less than six months elapsed between when LCS became aware of McClain's November 2017 complaint and when it eliminated his position in May 2018. At the prima facie stage, this temporal proximity is close enough to satisfy the "not . . . onerous burden" of showing a causal link between McClain's protected activity and LCS's adverse action. *Strothers*, 895 F.3d at 335; *see also Carter*, 33 F.3d at 460.

Accordingly, the Court finds that McClain has made out a prima facie case of retaliation.

## B.  Legitimate Justification for Adverse Action

Under the *McDonnell Douglas* burden-shifting framework, once the employee has established a prima facie case of retaliation, the employer can rebut the case by articulating a legitimate, nondiscriminatory justification for the adverse action. *Foster*, 787 F.3d at 250 (citing *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 285 (4th Cir. 2004) (en banc), *abrogated on other grounds by Nassar*, 570 U.S. at 360). Responding to budget constraints is a

legitimate reason for eliminating a position. *See Mereish v. Walker*, 359 F.3d 330, 335 (4th Cir. 2004); *Birkbeck v. Marvel Lighting Corp.*, 30 F.3d 507, 513 (4th Cir. 1994).

Here, LCS points to undisputed record evidence that Edwards eliminated McClain's assistant superintendent position as part of a reorganization needed to make up for a budget shortfall of $1 million. Dkt. 29-26 at 9–10. Edwards's May 4 letter specifically states that McClain's position was being eliminated "in response to budget constraints and [her] judgment as to the reorganization needed to achieve the current and future division educational goals," and "not based on employee performance." Dkt. 29-30. Edwards testified in her deposition that she thought the best way to meet the budget shortfall was by eliminating high-salary positions. Dkt. 29-26 at 10, 15. She noticed that the LCS Central Office included two assistant superintendent positions. *Id.* Based on her prior experience focusing on curriculum development in another school district, she thought she could manage the responsibilities associated with McClain's position without an assistant superintendent. *Id.* Therefore, she eliminated McClain's position. *Id.* Moreover, Edwards eliminated eleven other positions on the same day she eliminated McClain's. Dkt. 29-29. Five of those individuals, like McClain, were not automatically reassigned to new positions but rather given the opportunity to select an open teaching position in the district. *Id.* Both Caucasian and African-American employees were involved in the reorganization, including Brown, whom Edwards reassigned to a newly-created position after eliminating her old one. Dkt 29-29 at 8.

Thus, LCS meets its burden to provide a legitimate, nondiscriminatory justification for the adverse action, and "the presumption of retaliation is dissolved." *Sharif v. United Airlines, Inc.*, 841 F.3d 199, 203 (4th Cir. 2016).

### C.  But-For Causation

Under the *McDonnell Douglas* framework, if an employer articulates a legitimate justification for the adverse action, then the burden shifts back to the employee to show that the justification is pretextual and that retaliation was the "real reason" for the adverse action. *Foster*, 787 F.3d at 252 (quoting *Holland v. Wash. Homes, Inc.*, 487 F.3d 208, 218 (4th Cir. 2007)) (internal quotation marks omitted). The employee must persuade the court that "retaliation was a but-for cause of a challenged adverse . . . action." *Id.* (finding that *Nassar*'s but-for causation requirement "does not alter the legal standard for adjudicating a *McDonnell Douglas* retaliation claim").

To show pretext, the employee must do more than present conclusory or speculative allegations of retaliation. *Causey*, 162 F.3d at 801. Instead, the employee must show "either that an employer's explanation is not credible, or that the employer's decision was more likely the result of retaliation." *Sharif*, 841 F.3d at 203 (citations omitted). For example, an employee may show "that an employer's proffered nondiscriminatory reasons for the termination are inconsistent over time, false, or based on mistakes of fact." *Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 225 (4th Cir. 2019) (citing *E.E.O.C. v. Sears Roebuck & Co.*, 243 F.3d 846, 852–53 (4th Cir. 2001)) (finding sufficient evidence of pretext when employer asserted for the first time during litigation a new, different reason for termination—poor attitude—than the one initially offered—job abandonment). Still, the employee's "burden is only to show that the protected activity was a but-for cause of [his] termination, not that it was the sole cause." *Guessous*, 828 F.3d at 218 (citing *Foster*, 787 F.3d at 252). An employee will not survive summary judgment, however, by "focusing on minor discrepancies that do not cast doubt on the explanation's validity." *Hux v. City of Newport News*, 451 F.3d 311, 315 (4th Cir. 2006).

"In evaluating employer intent and the question of pretext, the district court may consider among other things, the historical background of the decision; the specific sequence of events leading up to the challenged decision; departures from the normal procedural sequence; and any contemporary statements by members of the decisionmaking body." *Sharif*, 841 F.3d at 205 (cleaned up) (internal quotation marks and citations omitted).

As described below, the Court finds that McClain fails to offer enough evidence to create a genuine dispute of material fact such that a reasonable factfinder could conclude that LCS eliminated his position and demoted him to a teaching position for "an impermissible reason." *Sharif*, 841 F.3d at 203 (citations omitted). Therefore, the Court concludes that McClain has not met his burden to demonstrate that LCS's budget balancing justification was pretextual, and his claims cannot survive summary judgment.

### 1.   Direct Challenges to Justification

To begin, McClain first argues that LCS's justification that he was fired due to budget constraints is inconsistent with the evidence in the record. McClain points to Edwards's deposition testimony that she requested $862,000 from City Council to pay teacher salaries for the 2018–2019 school year. Dkt. 32-22 at 20–24. In June 2019, however, she discovered that exact amount in LCS's existing budget. *Id.* That funding was returned to the City Council that month. *Id.*

However, the record shows that Edwards did not discover and return the $862,000 until June 2019, more than a year *after* Edwards made the decision to eliminate McClain's position. Dkt. 32-22 at 20–24. McClain does not produce evidence casting doubt on Edwards's deposition testimony that she was "a million short" and had "to cut [her] budget" and "come up with some kind of reorg[anization] plan" in April 2018, the month before she eliminated McClain's position. *Id.* at 24–25. In fact, McClain testified in his deposition that he provided input during the "process

of looking at ways to balance the budget." Dkt. 32-2 at 181. Therefore, there is no genuine dispute of material fact that Edwards and LCS faced a budget shortfall in April 2018, just before McClain's position was eliminated.

Next, McClain questions the necessity of eliminating his position and the sincerity of Edwards's reasoning for choosing to eliminate his position. McClain testified in his deposition that Edwards told him in December 2017, after she was selected to become superintendent but before she took on that position, that his role as the assistant superintendent for instruction and curriculum was perhaps the most important role in the district. Dkt. 32-2 at 170–71. McClain also testified that he offered an alternative reorganization structure to balance the budget that did not involve eliminating his position. *Id.* at 181–83. McClain further testified that the pay cut involved in taking a teaching position was a larger percentage of his prior salary—more than 50%—than for others offered similar teaching positions. *Id.* at 17, 192. He points to Edwards's decision to reassign Bruce, one of McClain's supervisees, to the newly created position of Director of Curriculum and Instruction, a position for which McClain would also have been qualified and which would have represented a smaller demotion than taking a teaching position. Dkt. 29-29 at 11. He also points to Edwards's decision to promote Copeland to deputy superintendent, a newly-created position for which Copeland was not required to apply and for which McClain was not offered an opportunity to apply. Dkts. 32-13 at 155; 32-2 at 275; 29-29 at 13. Finally, McClain offers evidence that LCS posted an opening for a deputy superintendent position "oversee[ing] all major aspects of teaching, learning and student growth and development"—nearly identical to his former job description—in June 2020.[5] Dkt. 32-83.

---

[5] LCS contends that this posting occurred several months after discovery in this case closed. Dkt. 34 at 17.

McClain's arguments fail to cast doubt on LCS's justification. Neither the contemporaneous consideration of an alternative reorganization plan, nor the promotion of certain colleagues, nor the opening of a similar deputy superintendent position more than two years later, undermines LCS's articulated justification for eliminating McClain's position. "Title VII is not a vehicle for substituting the judgment of a court for that of the employer." *DeJarnette v. Corning Inc.*, 133 F.3d 293, 298–99 (4th Cir. 1998) (internal quotation marks and citation omitted). And the Court "does not sit as a kind of super-personnel department weighing the prudence of employment decisions made by firms charged with employment discrimination." *Id.* at 299 (internal quotation marks and citation omitted).

That McClain might have made a different decision about how to reorganize the district were he in Edwards's shoes does not raise an inference that Edwards eliminated his position for an impermissible retaliatory reason. Although the demotion from assistant superintendent to teacher represented a large pay cut, Edwards testified in her deposition that she identified McClain's high-salary position as one to be eliminated precisely because of the cost savings that the district could realize from doing so. Dkts. 29-26 at 10; *see also* 29-28 at 5. If anything, this evidence further supports Edwards's testimony that she eliminated McClain's position to balance the budget.

With respect to Edwards's decision to assign Bruce instead of McClain to the Director of Curriculum and Instruction position, Edwards testified that "Bruce was in charge of all of the assessment data" and according to "[her] personal superintendent philosophy, data drives curriculum and instruction." Dkt. 32-22 at 40. Bruce "was [Edwards's] data person, and that was what [she] needed to move the needle forward." *Id.* McClain offers no evidence to contest

Edwards's testimony, and the Court cannot substitute its judgment for Edwards's judgment. *DeJarnette*, 133 F.3d at 298–99.

As for why Edwards eliminated McClain's position instead of Copeland's position, undisputed evidence in the record shows that Edwards believed that she could manage McClain's responsibilities on her own better than Copeland's operational responsibilities. Edwards testified at her deposition that she has a doctorate in "educational leadership, management, and policy," Dkt. 32-22 at 7, that her "background is curriculum and instruction and assessment, professional development," *id.* at 28, and that she had experience as "an assistant superintendent for [those areas]," *id.* She further testified that she "felt like if [LCS] had to make a cut there, [she] could handle that piece." *Id.* McClain does not provide any evidence contesting Edwards's experience, expertise, or belief that she could take on the responsibilities that McClain had performed.

Moreover, McClain's testimony that Edwards told him in December 2017 that his position was perhaps the most important one in the district does not call into question Edwards's justification. Nor does any evidence that in June 2020 LCS sought to hire a deputy superintendent to perform job responsibilities similar to those McClain once had. Edwards was confronted with the reality of a budget shortfall and the responsibility of addressing it in April 2018. Edwards may very well have made different decisions about reorganization if faced with different circumstances at different times, but the Court cannot engage in such speculation. "In retaliation cases, courts must determine what made the employer fire the employee *when it did*." *Guessous*, 828 F.3d at 218 (cleaned up) (internal quotation marks and citation omitted) (emphasis in original).

Finally, McClain was not treated more harshly than the five other LCS employees whose positions were eliminated and who were not reassigned to newly-created positions. Dkt. 29-29. Edwards offered all six employees, including McClain, the same opportunity to select an open

teaching position. Unlike the other five employees, McClain declined a teaching position. Dkts. 29-30; 29-31. In addition, accepting McClain's testimony that he was not initially told on May 2 that he could apply for any newly-created positions, Dkt. 32-75 at 1, undisputed evidence in the record shows that he became aware of the option to apply for such positions on May 18, when he received Edwards's May 4 letter. *See* Dkt. 29-32 at 6. Edwards's May 22 email correspondence with McClain also stated that he could accept a teaching position as long as he did so by May 25, and that "by accepting a teaching position, you may still apply for administrative or supervisor vacancies for which you are qualified, and your acceptance of the teaching position will not prejudice you in consideration of such other positions." Dkt. 32-75 at 2. And McClain acknowledged in his deposition that, during the May 2 meeting, Edwards told him, "[I]f you, rather than a teaching job, wish to try for some other superintendent vacancies that are opening, or some other things in other divisions, I will try to support you." Dkt. 32-2 at 193.

Ultimately, McClain does not offer sufficient evidence to create a genuine dispute of material fact about LCS's justification for eliminating his position.

### 2. Retaliatory Animus and Edwards's Independent Decision

McClain also attempts to provide evidence that Massie and the LCS Board retaliated against him for filing his complaint, and that their retaliatory animus shaped Edwards's decision to eliminate his position.

To show the LCS Board's retaliatory animus, McClain argues that Hall's investigation was biased. Hall testified that LCS's outside counsel, who was also Hall's employer's outside counsel, asked her to investigate McClain's complaint, even though she had never investigated race-based retaliation before. Dkt. 32-35 at 8–10. She also testified that she communicated with LCS's outside counsel as her investigation progressed. *Id.* at 18. In addition, Hall testified that—at Hall's

request—Gee provided her with "the documents from her investigation" into Hancock's complaint. *Id.* at 14.

At oral argument, McClain asserted that Hall's report unfairly branded him as a Caucasian man who would use African-American women to serve his own ends. In her report, Hall wrote, "I find it curious that Mr. McClain did not make a complaint on his own behalf, stating 'he was in a protected class,' but rather that he felt compelled to speak out on behalf of African American females because they are a protected class." Dkt. 29-18 at 3. She continued, "Dr. McClain's conduct and approach could lead a reasonable investigator to conclude that he filed this complaint to protect himself and his position, and not to advance the legitimate interests of the protected class of individuals he mentions in his complaint." *Id.*

Finally, McClain points out a discrepancy between the conclusions in Hall's report and the testimony of two African-American colleagues on whose behalf McClain filed his complaint. In the report, Hall stated that she asked Brown and Reeves "directly if they experienced harassment from Dr. Massie or Mr. Copeland based on their race. Both indicated they did not feel any concerns or issues were experienced based [on] race." Dkt. 29-18 at 2. Brown, however, testified that Massie once "talked down to" her in front of a colleague in a "tone of voice [that] was very condescending," noting that the incident upset her so much that "[she] was ready to quit that day." Dkt. 32-3 at 25–27. Reeves testified that she saw McClain's complaint for the "first time" during her deposition in this case, and that Hall had not asked her about any of the specific issues of racial harassment or discrimination that McClain had raised in his complaint. Dkt. 32-4 at 71–73.

The Court is not persuaded. Hall's ties to and communications with LCS's outside counsel during her investigation, without more, do not establish bias. Similarly, Gee's offer of documents from her investigation into Hancock's complaint in response to Hall's request for background

information does not show that Hall's investigation was biased. McClain offers no reason to doubt that Hall's conclusions were anything but her own. Even if Hall's investigation into McClain's complaint was not as thorough as it could have been, the LCS Board considered McClain's appeal and nevertheless upheld Hall's report. Dkt. 29-21 at 4. Most significant, McClain does not explain how Hall's bias, if any, translates into a motive on the part of the LCS Board to retaliate against him for filing his complaint.

Next, to show Massie and Copeland's retaliatory animus, McClain offers emails showing that Massie collected and shared information painting McClain in a negative light with the Lynchburg City Attorney and LCS's outside counsel after McClain filed his complaint but before Edwards eliminated his position. In December 2017, Beckles sent Massie an email stating that McClain "disrespected [Massie] in front of [Massie's] senior leadership team and principals" by suggesting "that he did not agree with the decision" to eliminate Hancock's position. Dkt. 32-63. Then, in January 2018, Gee wrote a memo implying that McClain "undercut Dr. Massie" when asked to share the same information about Hancock's position with his Student Learning and Success team. Dkts. 32-62. Massie emailed copies of these documents to LCS counsel on February 15—three days after McClain appealed Hall's investigation report—as "indicative of the situation with which I am contending at present." Dkt. 32-64. A few days later, on February 20, 2018, Massie sent LCS counsel documents implying that McClain had improperly promoted Hancock "without the knowledge or approval" of the LCS Board. Dkt. 32-66. Then, McClain points out that Beckles and Gee compiled a list of staff added to the Student Learning and Success department during McClain's tenure to support Massie's conclusion that the LCS Central Office was "overstaffed." Dkt. 32-69; *see also* Dkts. 32-8 at 111–12; 32-10 at 40, 49; 32-13 at 155. Massie later identified McClain's department as "overstaffed" in front of the Lynchburg City Council

when giving a presentation about the LCS budget at the end of March 2018. Dkt. 32-70 at 2–3. Finally, McClain points to evidence in the record that Copeland criticized and undermined him in front of other LCS Central Office staff after McClain filed his complaint. *See* Dkt. 32-61.

But McClain faces an additional causation hurdle. Even assuming McClain created a genuine dispute of material fact regarding whether the LCS Board, Massie, and Copeland intended to retaliate against him for filing his complaint, McClain must produce sufficient evidence from which a reasonable factfinder could impute or transfer that intent to Edwards, who made the independent decision to eliminate McClain's position. An employer is liable for retaliation only if the person with retaliatory animus "can be deemed a decisionmaker for, or agent of" the employer in taking adverse action against the employee. *Hill*, 354 F.3d at 290 (holding that the individual with discriminatory animus—who had no "supervisory or disciplinary authority over" the employee—was not the "actual decisionmaker" or "principally responsible" for decision to terminate employee, but "merely initiated the decisionmaking process that led to . . . the termination decision"). McClain does not dispute that Edwards, not Massie, eliminated his position. Thus, McClain must show that Edwards, the decisionmaker, had retaliatory motive.

McClain argues that Edwards's "view of McClain and his role was one that had been eroded by the retaliatory acts of Massie and Copeland." Dkt. 32 at 18. He points out that, although Massie testified in his deposition that he declined to discuss McClain's complaint with Edwards when she inquired about it, Massie did discuss the budget with Edwards before she became superintendent. Dkt. 32-10 at 50, 136–37. Copeland testified in his deposition that he told Edwards about McClain's complaint when she became superintendent in April 2018. Dkt. 29-5 at 5–7. In addition, Edwards testified that she was aware of Massie's March 2018 presentation to the Lynchburg City Council identifying McClain's Student Learning and Success department as

"overstaffed." Dkt. 32-22 at 17–18. Moreover, McClain testified in his deposition that "basically all" the positions that Edwards eliminated were "related to instruction." Dkt. 32-2, 196; *see also* Dkt. 29-29.

But Edwards had no connection to LCS at the time McClain complained to the Board. Dkt. 29-24. And Massie and Edwards both stated that they never discussed McClain's complaint. Dkts. 32-10 at 50; 32-22 at 98–100. Nor did Nilles and Edwards discuss McClain's complaint. Dkts. 32-9 at 39; 32-22 at 98–100. Only Copeland testified that he informed Edwards of McClain's complaint and his strained relationship with McClain. Dkt. 29-5 at 5–7. Yet Copeland's influence on Edwards, if any, is insufficient to show that LCS retaliated against McClain. *Balas v. Huntington Ingalls Indus., Inc.*, 711 F.3d 401, 410–11 (4th Cir. 2013) (refusing to "endorse a construction of Title VII that would treat a subordinate who has no supervisory or disciplinary authority and who does not make the final or formal employment decision as a decisionmaker simply because he had a substantial influence on the ultimate decision or because he has played a role, even a significant one, in the adverse employment decision") (internal quotation marks omitted) (quoting *Hill*, 354 F.3d at 291). And Edwards's awareness that Massie identified McClain's curriculum and instruction department as "overstaffed" to the Lynchburg City Council does not transfer Massie's retaliatory intent, if any, to her. Although this knowledge could have directed Edwards's attention toward McClain's department as a possible place to make personnel cuts, McClain offers no evidence to suggest that Edwards did not engage in an independent and informed decisionmaking process before eliminating his position.

Ultimately, McClain's efforts to connect his complaint with LCS's subsequent elimination of his superintendent position and demotion to a teaching position because of budget cuts do not rise above mere speculation. Therefore, the Court finds that McClain fails to "cast sufficient doubt

upon the genuineness of the explanation to warrant a jury's consideration of possible alternative and discriminatory motivations for the firing." *Guessous*, 828 F.3d at 218 (internal quotation marks and citation omitted). Accordingly, LCS is entitled to summary judgment on McClain's Title VII and § 1981 retaliation claims in Counts I and III.

## IV.   CONCLUSION

For the foregoing reasons, the Court will dismiss Counts II and IV and award summary judgment to LCS on Counts I and III.

An appropriate Order will issue.

The Clerk of Court is directed to send this Memorandum Opinion to all counsel of record.

Entered this 31st day of March, 2021.

NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE